***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Dollar with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. National Benefits America was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on November 8, 2001, and defendants filed an I.C. Form 63 to pay without prejudice on November 28, 2001.
5. Plaintiff's average weekly wage was $468.53, which yields a compensation rate of $312.37 per week, based upon the Form 22.
6. The issues for determination are:
 a. Is plaintiff entitled to receive continuing temporary total disability and medical benefits?
 b. Did the Industrial Commission correctly terminate plaintiff's temporary total disability benefits after plaintiff was released to return to work without restrictions?
 c. Is plaintiff entitled to additional medical treatment after she has been found to have reached maximum medical improvement?
7. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit 1 — Plaintiff's medical records, I.C. Forms, Rehabilitation Records, and correspondence from John Urban, (326 pages), and
b. Stipulated Exhibit 2 — Claim payment history.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a thirty-six year old tenth grade educated female. She is a smoker. She had a prior hysterectomy and oopherectomy. She also had a prior left ankle fracture that required surgical repair with plate and screws. In addition, she had three prior left knee surgeries and had previously been diagnosed with osteoporosis. She began working for the employer in 2001 as a house builder where her duties included working with cedar shake siding. She performed strenuous work on the job site, where she was required to wear steel-toed boots.
2. On November 8, 2001, plaintiff sustained a compensable injury to her right foot when she slipped in a hole in a sandy area, as she was checking job plan measurements. Following the injury, she was taken to Cape Fear Hospital Emergency Room where she was diagnosed with a non-displaced crack at the bases of the second, third and fourth metatarsals. She was given a splint for her right foot and referred to Dr. Landon Anderson of Atlantic Orthopedics.
3. Dr. Anderson examined plaintiff on November 13, 2001, for the non-displaced crack at the base of the second metatarsal. He placed her in a short walking cast. At the initial visit, plaintiff reported a history of prior left ankle surgery with screws, three prior left knee surgeries, and osteoporosis. By December 18, 2001, Dr. Anderson released plaintiff to light duty sitting work. X-rays showed a healing fracture. Dr. Anderson ordered therapy for gait training and strengthening for two weeks.
4. Between December 18, 2001 and January 4, 2002, plaintiff only attended four physical therapy sessions at Wilmington Physical Therapy.
5. Plaintiff returned to Dr. Anderson on January 7, 2002, with continuing pain complaints. He ordered three to four weeks of additional therapy. Dr. Anderson released plaintiff to sit-down work until January 28, 2002.
6. After plaintiff requested another doctor, defendants referred her to Southeastern Orthopaedics and Sports Medicine where Dr. William Alexander Huff examined her on January 9, 2002. Plaintiff complained of pain at the base of the second metatarsal to the fourth and fifth metatarsal heads. On examination, Dr. Huff found nothing to suggest reflex sympathetic dystrophy (RSD). He did find osteopenia and possible neuropathic pain.
7. By February 19, 2002, Dr. Huff had ordered a bone scan and SED rate, which indicated intense activity in right mid-foot consistent with history of fracture. Dr. Huff released plaintiff to light duty work at that time. On March 12, 2002, Dr. Huff released her and recommended an evaluation for possible neuropathic pain, after plaintiff complained that her condition was worsening; and she would not allow Dr. Huff to fully examine the right foot. The partial exam indicated no temperature difference, no swelling and no instability found. Dr. Huff recommended an evaluation with a foot and ankle specialist.
8. On April 15, 2002, foot specialist Dr. Al Marr of Wilmington Orthopaedic Group examined plaintiff, at which time she reported burning pain and cold toes at the end of the day. She walked with a slight limp on the right side. Dr. Marr noted plaintiff's complaints were consistent with reflex sympathetic dystrophy. He referred plaintiff for pain management.
9. Dr. Frank Crowl of Atlantic Pain Medicine examined plaintiff on May 29, 2002 for pain in the right forefoot. Based on the exam, Dr. Crowl administered two L2 right lumbar sympathetic blocks. By July 24, 2002, Dr. Crowl released plaintiff to Dr. Marr's care, as she did not have sympathetic pain.
10. In August of 2002, plaintiff went to the employer's office to pick up her indemnity check. At that time, Ms. Manning observed plaintiff climb in the back of a large truck to look at some furniture which was for sale. Plaintiff did not exhibit any difficulty climbing in or getting down from the truck. She also did not limp or exhibit any difficulty walking at that time.
11. At the September 10, 2002 appointment, Dr. Marr found no change, no significant swelling; and he released plaintiff after repeat x-rays showed the fractures healed. Following this release, plaintiff requested authorization from the carrier to been seen by another physician. Karen Fisher authorized her to see board certified physical medicine and rehabilitation specialist Dr. Alan Tamadon.
12. Between October 8, 2002 and November 15, 2002, Dr. Tamadon evaluated plaintiff and ordered therapy. Prior to treating plaintiff, Dr. Tamadon reviewed treatment records from Dr. Anderson, Dr. Huff, Dr. Marr and Dr. Crowl. On examination at the October 8 initial visit, Dr. Tamadon found no evidence of soft tissue swelling or atrophic skin changes, no abnormal hair growth pattern, and no erythema or abnormal temperature changes. Plaintiff's reflexes were symmetrical and normal with sensation in tact. She was able to heel-toe walk. Dr. Tamadon found her left leg slightly longer than the right.
13. Dr. Tamadon reviewed x-rays, which showed good healing of the second metatarsal non-displaced fracture. After the examination, Dr. Tamadon diagnosed plaintiff with right foot pain, osteopenia and nicotine addition. He discussed the osteopenia with plaintiff and recommended she follow up with her primary care doctor. He explained, due to osteopenia, she was on the road to osteoporosis. Dr. Tamadon recommended she follow up with her primary care physician for treatment for bone thinning. He also ordered two weeks of physical therapy for range of motion and to assist plaintiff in using the TENS unit.
14. At the October 25, 2002 appointment, plaintiff reported she did not go to therapy for fear it would be painful. She only attended one session and later reported that the TENS unit caused her pain, as her rationale for not attending therapy. She requested pain medication for the therapy sessions with the TENS unit, but Dr. Tamadon instructed that pain medications would not be given for the therapy sessions. At the time of the exam, she wore tennis shoes and did not exhibit any gait problems. Dr. Tamadon performed the electro-diagnostic studies, which were all found to be normal. Based upon these studies, he found plaintiff did not have RSD and did not have a neuropathic injury, as nerve conduction studies were also normal.
15. If plaintiff reported pain from the TENS unit, it would be due to her not properly using the pain-relieving device, as the purpose of the TENS unit is not to cause pain, but rather to relieve pain. Therefore, plaintiff's testimony and representations regarding the TENS unit and her alleged pain are rejected as not being credible.
16. On November 7, 2002, plaintiff refused treatment in therapy. By November 15, 2002, Dr. Tamadon found plaintiff had reached maximum medical improvement and retained a two percent permanent partial impairment due to her subjective complaints of pain. He released her to return to work with no restrictions.
17. Dr. Tamadon found it likely plaintiff sustained the fractures either due to bone marrowization or bone density, or because her boot was compromised.
18. On November 21, 2002, defendant-employer sent plaintiff a written return-to-work offer as a laborer, in which she was to report to work on November 22, 2002. However, plaintiff did not report to work as requested. Defendants made a second offer verbally and in writing on November 22, 2002 for her to return to work as a laborer on November 25, 2002.
19. Plaintiff called the employer on or about the afternoon of November 22, 2002 to advise she could not do the job. She spoke to office manager Janice Manning. At that time, plaintiff did not request additional medical treatment, nor did she request any work accommodation.
20. Plaintiff did not accept the two job offers in November of 2002. Her refusal to accept suitable work was unjustified.
21. Plaintiff was disabled from earning wages from November 9, 2001 through November 15, 2002, as a result of the compensable injury. Defendants paid temporary total disability benefits to plaintiff from November 9, 2001 through April 4, 2003, as a result of the right foot injury.
22. On or about December 4, 2002, the carrier filed an I.C. Form 24 Application to Terminate Benefits. By Order filed on January 24, 2003, the Commission approved the Form 24, authorizing defendants to terminate benefits, effective December 4, 2002.
23. On or after December 17, 2002, plaintiff prepared an I.C. Form 18 on which she alleged her right foot injury occurred when she was digging a hole; and the ground around the hole collapsed, causing her to fall, which resulted in her injuring her foot. This allegation is rejected as not credible. As plaintiff reported a different version as to the nature of the injury on November 8, 2001 when she was seen at Cape Fear Hospital for treatment, it is reasonable to assume that her memory regarding how the injury occurred would have been better on the day of the incident rather than thirteen months later.
24. Special Deputy Commissioner Franklin rescinded the January 24, 2003 Order after plaintiff's counsel informed her he did not receive notice of the Form 24. A second telephonic hearing on the Form 24 was then convened on March 25, 2003. By Order filed on April 2, 2003, the Form 24 application was approved, based upon findings plaintiff was released to return to full duty work without restrictions on November 15, 2002 and defendants had offered suitable employment. Plaintiff filed another Motion for Reconsideration, which was denied by Order filed on May 5, 2003.
25. Since her release to return to work on November 15, 2002, plaintiff has made no effort to obtain a job.
26. On or after March 4, 2003, plaintiff filed a Motion for further treatment and was authorized to seek a one-time independent evaluation.
27. On May 21, 2003, board certified anesthesiologist Dr. Richard L. Rauch evaluated plaintiff upon referral by her attorney. Dr. Rauch found normal strength testing, ability to heel-toe walk, no temperature difference and no abnormal hair or nail growth, no color changes and no swelling of the right foot. Although based upon her subjective history, Dr. Rauch suspected complex regional pain syndrome; however, the objective physical findings did not support the diagnosis. Therefore, Dr. Rauch suspected possible neuropathic pain.
28. In an August 19, 2003 letter, Dr. Rauch wrote to plaintiff's counsel stating she had complex regional pain syndrome. In his deposition, Dr. Rauch admitted plaintiff did not meet the subjective diagnostic guidelines to qualify for a diagnosis of complex regional pain syndrome.
29. Although Dr. Tamadon specifically discussed her osteopenia and the need to stop smoking, plaintiff denied at the hearing that any doctor had instructed her to cease smoking or that her smoking caused bone loss. Plaintiff's testimony is rejected as not being credible.
30. The competent medical evidence in the record supports a finding that plaintiff does not have reflex sympathetic dystrophy or complex regional pain syndrome.
31. Although osteopenia may be seen in third-stage reflex sympathetic dystrophy due to disuse, there is no evidence plaintiff had reflex sympathetic dystrophy nor is there evidence she developed osteopenia due to disuse. Rather, the competent evidence in the record supports a finding plaintiff had osteopenia and osteoporosis prior to the compensable fracture. Any medical opinion to the contrary is not based on the factual evidence in the record and is, therefore, rejected as sufficiently reliable to constitute competent evidence on the matter.
32. As plaintiff's nerve conduction studies were normal, there is no objective testing to support a finding that plaintiff had a neuropathic injury.
33. After she reached maximum medical improvement on November 15, 2002, plaintiff refused to accept two job offers of work suitable to her capacity.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682(1982). "If an award is made by the Industrial Commission, payable during disability, there is a presumption that disability lasts until the employee returns to work. . . ."Watkins v. Central Motor Lines, 279 N.C. 132,181 S.E.2d 588(1971). However, as stated in Commission Rule 404(1), this presumption of continued disability is rebuttable. Stone v. G. G.Builders, 346 N.C. 154, 484 S.E.2d 365 (1997). While in this case plaintiff does not have the presumption of ongoing disability, defendants have nevertheless successfully rebutted any presumption of continued disability by showing suitable work has been available for plaintiff since she reached maximum medical improvement and was released to return to full duty work on November 15, 2002, and despite two separate offers of suitable work, she refused to make any effort to attempt to perform the suitable employment.
2. Plaintiff is not entitled to any further compensation during her continued refusal to accept suitable employment. N.C. Gen. Stat. § 97-32.
3. Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. Pilot Freight Carriers, Inc., 300 N.C. 164,265 S.E.2d 389 (1980). The Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. Expert opinion that rests on speculation and conjecture, or unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Young v. Hickory BusinessFurniture, 353 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, Dr. Rauch's opinion testimony rests on the inaccurate subjective history of onset and symptoms as related by plaintiff, rather than on the objective testing and examination criteria. Therefore, his opinion is specifically rejected as not sufficiently reliable to qualify as competent evidence on the nature and cause of the injury.
4. Plaintiff is entitled to permanent partial disability compensation at the rate of $312.37 per week for 2.88 weeks as a result of the two percent rating to the right foot. N.C. Gen. Stat. § 97-31(14). Defendants are entitled to a credit for overpayment of benefits from November 15, 2002. N.C. Gen. Stat. §97-42.
5. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to a reasonable attorney's fee for plaintiff's former counsel herein approved, defendants shall pay permanent partial disability compensation at the rate of $312.37 per week for 2.88 weeks. However, defendants are entitled to a credit for overpayment of benefits from November 15, 2002.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from sums paid to plaintiff and directed to counsel.
3. Defendants shall pay medical expenses incurred when bills for the same have been approved, in accordance with the provisions of the Act, including the one-time evaluation with Dr. Richard Rauch of Piedmont Anesthesia and Pain Consultants.
4. Each side shall pay its own costs.
This the ___ day of August, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER